IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA     )
                             )
        v.             )       1:10CR348-1
                             )
TREMAYNE DEVON SCOTT       )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion of the Defendant Tremayne Devon Scott ("Scott") to suppress certain controlled substances that law enforcement officers seized from a bag located on the front passenger's seat of his automobile. (Doc. 10.) An evidentiary hearing was held on November 22, 2010, and the motion has been fully briefed. For the reasons set forth herein, the motion is denied.

## I. BACKGROUND

At the November 22, 2010, evidentiary hearing, the Government presented the testimony of Investigator R. Broadwell ("Broadwell"), a 12-year veteran and investigator with the Durham (North Carolina) Police Department's ("DPD") Special Operations Division (Interdiction Unit), and Charles Davidson, III ("Davidson"), a 16-year veteran and corporal of the DPD's "heat team," which investigates street crimes. Scott also testified on his own behalf. As a result of the evidentiary

hearing, the court finds the following facts based on the preponderance of the evidence.

During daylight hours on April 28, 2010, various units of the DPD were investigating suspected drug activity in Durham, North Carolina. Some of the DPD officers, including Broadwell, had been following an individual for whom arrest warrants for drugs charges were outstanding. The individual had been observed entering a vehicle, proceeding to 1011 Maureen Road, exiting the vehicle, and entering apartment number 8. Upon their arrival at the apartment area, officers learned that another DPD unit was surveilling that same apartment for drug activity. The DPD had received a complaint of suspected drug activity two weeks earlier as to apartment 8 and Scott, its owner. The complaint included information from the realty agent of the unit, who advised there were "numerous sales, heavy traffic to and from the apartment all times of the day and night, and the tenants around him [Scott] were scared."

After a few minutes, the individual the officers were watching exited apartment 8 with another person and got into a vehicle, where they appeared to be rolling a marijuana "joint" to smoke. Broadwell was instructed to stop the vehicle as it started to leave, which he did, and other DPD officers attended to it. Davidson heard the DPD officers state, as they arrested

the individuals, that they had recovered drugs in their possession.

Broadwell and Davidson began walking toward apartment number 8 to conduct a "knock and talk" when they observed Scott exit the apartment and walk across the short parking lot toward a four-door automobile. As he walked, Scott carried a blue bag in his right hand. As soon as he saw the two officers approaching him, Scott moved the bag to his left hand and used his body to shield the bag from the officers.

Broadwell called out to Scott twice and asked if he had any identification. After the second command, Scott finally stopped and said his identification was in his car. In response to a question by Broadwell, Scott acknowledged that he lived in apartment 8. Broadwell advised again that he would need to see his identification, and Scott said he would need to get it from his car. Broadwell said, "that's fine" and advised him to get it.

Broadwell and Davidson continued to walk toward Scott as he approached the car. They were within ten feet of him when they observed him open the driver's side car door, take the bag from his left hand, and toss it onto the front passenger seat. As the bag hit the center console, Broadwell, who by now had moved to within a foot or two of Scott, heard a sound "like [] a

3

plastic container" hit the console before the bag settled onto the passenger seat.

Contrary to his previous statement that his identification was in his car, Scott retrieved his identification from his pants pocket. Davidson advised Scott that the officers were conducting a drug investigation, that they had detained the other individual who had just left his apartment, and that they had a complaint regarding Scott's alleged sale of drugs from his apartment.

Broadwell asked if Scott would mind his looking inside the bag, and Scott objected, saying it contained only clothes. Broadwell then asked whether anyone else was in his apartment, to which Scott responded, "no," just his dog. Moments after that, however, Broadwell and Davidson observed a male answer the door at the apartment in response to two other DPD officers' contact.

Either Broadwell or Davidson asked Scott whether he had any drugs in the blue bag. In the course of this discussion, Scott tried to reach inside the car, and Broadwell warned him not to do so. Shortly thereafter, Scott again attempted to reach inside the car, and again Broadwell told him he was not allowed to do so. During his discussion with Scott, Broadwell moved

closer to the door.[1]  As Davidson explained why it was important for safety reasons that Scott not reach into the car, Scott said "I just want to get my cigarettes."

The officers moved Scott further toward the rear of the car, and Broadwell asked Scott where he kept his cigarettes, indicating that he would get one for him.  As Broadwell recalled, Scott said "okay," or "that's fine" (Davidson recalled him saying "go ahead"), and advised that they were in the passenger seat or center console area.  Broadwell reached into the car, retrieved the cigarette pack which had been resting on the passenger seat near the center console, removed a cigarette, and replaced the pack in its original location.  In doing so, Broadwell saw what he "definitely" believed to be marijuana in the plastic bag.

Broadwell gave Scott a cigarette and permitted him to smoke it while he advised Scott and Davidson that he had seen "weed" (the marijuana) in the bag in the car.  Scott claimed that the marijuana was just for his personal use.  The officers told Scott that they knew he had "weed" and asked whether he had anything else and wanted to cooperate.

---

[1] Broadwell also testified that at that point he had already moved over toward the door where he was standing, was looking inside the vehicle, and could see a clear plastic bag with a green vegetable matter which he believed was marijuana.  The Government does not appear to argue that this provided a basis for the seizure based on the plain view doctrine.  Therefore, the court does not address it.

After Scott had smoked his cigarette, he was arrested and Davidson placed him in handcuffs. Broadwell conducted a search of the blue bag, finding cocaine base ("crack"), powder cocaine, and marijuana.[2] Officers also asked Scott whether they could search his apartment. Scott executed a consent form, introduced (without objection) as Government's Exhibit 3, permitting the apartment search.[3]

---

[2] There is some confusion in the testimony as to when officers took photographs of the blue bag in relation to when they examined its contents. Scott points to testimony that Broadwell examined the bag's contents before the bag was photographed sitting in the passenger seat, thus insinuating that Broadwell may have staged the bag for the photographs to reveal the marijuana and attacking Broadwell's credibility generally. Broadwell testified at one point that he could not remember moving the bag before photographs were taken; Davidson said that he was not present when the photographs were taken and believed that Broadwell had picked up the bag to show him the marijuana and cocaine. The court does not find that any inconsistency in the officers' versions of the events is so great as to undermine their testimony relevant to the court's finding of consent in this case.

[3] Scott's version of the events differed greatly from that of the officers. Scott testified that he was on his way to his job at a pizza restaurant and had been called in earlier than normal "because Duke [University] had a basketball game." He says he carefully and deliberately placed the blue bag on the passenger seat so its contents could not possibly be seen from the driver's side (the vantage point of the officers), grabbed his identification from the overhead headliner of the car and not from his pocket, and attempted to close the car door but was blocked by officers from doing so. He also claims that when Broadwell was not satisfied with Scott's answer that he had clothes in the bag, Broadwell grabbed the bag and examined its contents, finding the cocaine. Broadwell then allegedly said, "you're f—ked," cursing. Other than to get his identification, Scott denies ever trying to reach inside the vehicle or indicating that he was trying to retrieve a cigarette. Scott specifically denies ever consenting in any fashion to Broadwell's entry into his car to retrieve a cigarette. Scott does admit to smoking a cigarette, though he claims he did so later on the porch of his apartment, and he did

## II. ANALYSIS

The Fourth Amendment to the U.S. Constitution provides, in pertinent part: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[4]  U.S. Const. amend. IV.  Although a warrantless search or seizure is presumptively unreasonable, see Kyllo v. United States, 533 U.S. 27, 32 (2001), this rule is "subject to certain exceptions," Brigham City v. Stuart, 547 U.S. 398, 403 (2006).  The Government bears the burden of proving that such an exception justifies the DPD officer's conduct in this case.  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).

---

not challenge the Government's proof that he executed the consent form to search the apartment.

Scott's facts are plainly at odds in several respects with those offered by Broadwell and Davidson (e.g., Broadwell and Davidson never observed Scott reach up to retrieve anything from the headliner of the car, they saw Scott retrieve his identification from his pocket, they claim Scott consented to their retrieval of a cigarette, and they did not seize the blue bag before Broadwell observed the marijuana), apart from his suspicious statement that a Duke basketball game was held that day.  See www.ncaa.com/champ/m-baskbl-d1-champ.html (last visited Nov. 29, 2010) (noting that the NCAA men's basketball season ended with Duke's winning of the national championship on April 5, 2010).  The court recognizes there are potential inconsistencies with both sides' version of the encounter.  In light of the totality of the evidence, the court finds that the officers' testimony as to the key facts that underlie the court's ruling is generally more believable.

[4] The Fourteenth Amendment incorporates the rule excluding evidence obtained through an illegal search or seizure and makes it applicable to the states.  Mapp v. Ohio, 367 U.S. 643, 655 (1961).

The Government frames the issue as whether the DPD officer had valid consent to enter the car and thereafter observed the marijuana in plain view. (Doc. 11 at 3-5.) The Government claims that Scott authorized Broadwell to enter his car in order to retrieve a cigarette from the passenger's seat and that Broadwell saw the marijuana in the blue bag as he did so. (Id.) Scott contends that he never consented to the entry into his car and that the seizure violated his Fourth Amendment rights.[5] (Doc. 10 at 3-7.)

**A. Police-Citizen Encounter/Detention**

The court's analysis begins with the DPD officers' confrontation with Scott in the parking lot of his apartment building.

**1. Police-Citizen Encounter**

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . ." Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal quotation marks omitted). Just as an ordinary citizen can approach another on the street and ask

---

[5] Scott also argues that the DPD officers could not justify the entry into his car as a protective sweep, contending that the record fails to demonstrate (1) a "reasonable, individualized suspicion that [he] [wa]s dangerous" and (2) "a reasonable likelihood that [he] may gain immediate control of any weapons inside the vehicle." (Doc. 10 at 4-7). The court need not resolve this issue because the Government does not seek to uphold the entry into the vehicle as a protective sweep.

questions, "officers remain free to seek cooperation from citizens on the street without being called upon to articulate any level of suspicion or justification for their encounters." United States v. Burton, 228 F.3d 524, 527 (4th Cir. 2000). By the same token, a citizen encountered in this manner has "an equal right to ignore his interrogator and walk away." Terry v. Ohio, 392 U.S. 1, 33 (1968) (Harlan, J., concurring).

At the evidentiary hearing, Scott's counsel conceded that "walking up to [Scott] is certainly not problematic," "even in the absence of [information and complaints about him]." Scott's counsel subsequently reiterated that "[c]learly [the DPD officers] have a right to be in Mr. Scott's presence." Thus, the police-citizen encounter was constitutionally permissible, and the DPD officers had the right to approach Scott in the parking lot of his apartment building question him about his identity, place of residence, and belongings.

### 2. Detention

"A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a 'reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" Burton, 228 F.3d at 527 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotation

marks omitted)). "Reasonable suspicion is a commonsensical proposition," United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993), and "is something more than an 'inchoate and unparticularized suspicion or hunch,'" Burton, 228 F.3d at 527-28 (quoting Terry, 392 U.S. at 27 (internal quotation marks omitted)); accord United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004); see United States v. Arvizu, 534 U.S. 266, 273 (2002). Courts should "credit[] the practical experience of officers who observe on a daily basis what transpires on the street." Lender, 589 F.2d at 154.

The existence of reasonable suspicion is judged based on the "totality of the circumstances," which includes the information known to the officer and any reasonable inferences to be drawn therefrom. United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989). The level of suspicion necessary to conduct a Terry stop has been said to be "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Quarles, 330 F.3d 650, 653 (4th Cir. 2003) (quoting Alabama v. White, 496 U.S. 325, 329-30 (1990)). Courts will consider a wide range of factors when determining the legality of a stop. For example, courts may consider evasive conduct short of outright flight, such as "walking away from approaching

officers at a quick pace and ignoring commands to stop." <u>United States v. Smith</u>, 396 F.3d 579, 585 (4th Cir. 2005).

In this case, the DPD officers had reasonable articulable suspicion to elevate the police-citizen encounter into an investigatory detention. They had ample information that Scott may have been engaged in drug trafficking. They had received a complaint from the landlord about Scott's suspected drug activity in his apartment, and they had observed suspicious conduct only moments before the encounter when others left Scott's apartment, rolled what appeared to be a marijuana joint in their car, and were found to have drugs on them upon their arrest. Moreover, Scott acted suspiciously with the blue bag, ignored officers' commands to stop, and gave obviously false information about both his identification and whether anyone was present in his apartment. Taken together, these facts were sufficient to create reasonable suspicion to detain Scott for the brief questioning.

### B. Voluntary Consent

The next issue is whether Scott voluntarily consented to the DPD officer's entry into his car. "Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches." <u>United States v. Neely</u>, 564 F.3d 346, 349-50 (4th Cir. 2009) (per curiam) (internal quotation marks

omitted); <u>accord</u> <u>Schneckloth</u>, 412 U.S. at 219. Where a defendant challenges a law enforcement officer's entry into a car, the court must determine, based on a totality of the circumstances, whether the defendant consented and, if so, whether the defendant consented freely and voluntarily. <u>See</u> <u>United States v. Mendenhall</u>, 446 U.S. 544, 557 (1980); <u>United States v. Lattimore</u>, 87 F.3d 647, 650 (4th Cir. 1996) (en banc); <u>United States v. Elie</u>, 111 F.3d 1135, 1144 (4th Cir. 1997). As noted <u>supra</u>, Scott contends that he never consented to the entry into his car. Alternatively, he argues that any such consent was not voluntary.

### 1. Consent

"[C]onsent to search can be implied from a person's words, gestures, or conduct." <u>United States v. Moreland</u>, 437 F.3d 424, 429 (4th Cir. 2004). Although consent must constitute more than mere acquiescence to apparent lawful authority, <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-49 (1968); <u>Lattimore</u>, 87 F.3d at 652, courts (albeit some in unpublished opinions) have recognized that consent may be expressed through words such as (1) "okay," <u>e.g.</u>, <u>United States v. Debrew</u>, No. 93-5766, 1994 U.S. App. LEXIS 32883, at *3, 10 (4th Cir. Nov. 15, 1994) (holding that the district court did not clearly err in finding that the defendant had consented to a search of his luggage by

12

stating, "Okay, I don't mind"); see e.g., United States v. Roget, 127 F. App'x 505, 506 (D.C. Cir. 2005) (holding that the district court did not err in finding that "a reasonable police officer under this circumstance would understand the word 'okay' as an unambiguous expression of consent"); (2) "fine," e.g., United States v. Johnson, 107 F. App'x 322, 325 (4th Cir. 2004) (noting that the defendant had consented to the officer's request to search his vehicle by stating, "fine"); and (3) "go ahead," e.g., United States v. Jones, 356 F.3d 529, 532, 533 (4th Cir. 2004) (holding that the district court did not clearly err in finding that the defendant had consented to the officer's request to search his bag by responding, "sure, go ahead"); United States v. Smith, No. 97-4935, 1998 U.S. App. LEXIS 29933, at *5 (4th Cir. Nov. 23, 1998) (per curiam) (holding that the district court did not clearly err in finding that the defendant had consented to the search of her car by stating, "go ahead"). The Government bears the burden of establishing the existence of consent.    See Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality opinion).

In this case, the court finds that Scott granted Broadwell consent to enter his car.  During his discussion with the DPD officers about the contents of the blue bag, Scott twice attempted to reach inside his car.  Scott claimed that he

13

"want[ed] to get [his] cigarettes." Although Broadwell prevented Scott from reaching inside the car, Broadwell stated that he would get one for him and asked where he kept the cigarettes. Scott responded, "okay," "that's fine," and/or "go ahead" and told Broadwell they were on the front passenger seat near the console.

Even though Broadwell stated that he would get a cigarette for Scott rather than requesting permission, Scott did not merely acquiesce to apparent lawful authority. Broadwell's statement reasonably could be interpreted as an offer — in response to Scott's repeated attempts — to retrieve a cigarette for him, instead of a declaration of his intent to enter the car without consent. This is how Scott appears to have interpreted Broadwell's statement — as a question rather than as a declaration — because he answered affirmatively — "okay," "that's fine," or "go ahead." See United States v. Gallardo, 495 F.3d 982, 988 (8th Cir. 2007). Furthermore, the context of the conversation also supports the interpretation of Broadwell's statement as a request because Scott immediately advised Broadwell that the cigarettes were located in the passenger seat or center console area. It is doubtful that Scott would have provided this information had he not wanted officers to enter his car. Thus, the totality of the circumstances indicates that

14

Scott's response could reasonably have been interpreted as consent to enter the car.

## 2. Voluntariness

Finding that Scott consented to the entry into his car, the next question is whether this consent was voluntary. The Government bears the burden of proving, by a preponderance of the evidence, that it obtained a knowing and voluntary consent to a search. Mendenhall, 446 U.S. at 557; United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). "[T]he Government must shoulder the burden of proving that an individual freely and intelligently [gave] . . . unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied." United States v. Morrow, 731 F.2d 233, 235-36 (4th Cir. 1984) (internal quotation marks omitted). In determining whether a defendant's consent was voluntary, the inquiry is whether it was his own "'essentially free and unconstrained choice'" or whether his "'will ha[d] been overborne and his capacity for self-determination critically impaired.'" United States v. Watson, 423 U.S. 411, 424 (1976) (quoting Schneckloth, 412 U.S. at 225). This determination is based on "the totality of all the circumstances." Schneckloth, 412 U.S. at 227.

In making this assessment, "it is appropriate to consider the characteristics of the accused (such as age, maturity,

education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." Lattimore, 87 F.3d at 650; accord United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002). Other relevant factors include the degree to which an individual cooperates with the law enforcement officers, United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994); United States v. Whitehead, 428 F. Supp. 2d 447, 452 (E.D. Va. 2006), whether the accused knew that he had the right to refuse consent, Lattimore, 87 F.3d at 650; accord United States v. Boone, 245 F.3d 352, 362 (4th Cir. 2001), and the defendant's prior experience with the criminal justice system, Watson, 423 U.S. at 424-25. No single factor is dispositive. See Weaver, 282 F.3d at 313.

Here, Scott (whose age was not given) is clearly an adult. During his testimony at the suppression hearing, he was able to understand and answer questions easily. At no time did he "display[] any characteristics that would render him incapable of voluntarily consenting or withholding consent to the search" of his car. United States v. Hinton, 27 F. App'x 252, 254 (4th Cir. 2001) (per curiam); accord United States v. Tyson, 360 F. Supp. 2d 798, 806 (E.D. Va. 2005). Further, no evidence

16

suggests that he was "under the influence of any narcotics[,] . . . . mentally deficient, or unable to exercise free choice," Tyson, 360 F. Supp. 2d at 806, when he authorized Broadwell to enter the car to retrieve a cigarette. Rather, he was an adult and was able to converse intelligently with the officers.

Generally, an encounter is not coercive if it occurs in a public place or a familiar setting. United States v. Carter, 300 F.3d 415, 423 (4th Cir. 2002) (per curiam) (accused's home); Weaver, 282 F.3d at 312 (public parking lot). Here, the encounter took place in the parking lot of Scott's apartment building. Because the encounter took place during daylight hours, its timing is not coercive, either. See United States v. Nanda, No. 97-5001, 1999 U.S. App. LEXIS 9028, at *2, 16 (4th Cir. May 11, 1999) (per curiam) (8:30 on an August morning); Elie, 111 F.3d at 1145 (middle of the afternoon); Leano v. United States, 334 F. Supp. 2d 885, 892 (D.S.C. 2004) (broad daylight).

The conduct of the officers does not appear to have been coercive or intimidating. Only two of them, Broadwell and Davidson, questioned Scott. See Elie, 111 F.3d at 1145 (at least six officers); Tyson, 360 F. Supp. 2d at 804 (approximately six or seven agents). The officers were in plain clothes, which is less intimidating than being in uniform. See

17

_Weaver_, 282 F.3d at 312; _United States v. Salas_, No. 98-4374, 1998 U.S. App. LEXIS 32633, at *6-7 (4th Cir. Dec. 31, 1998) (per curiam); _United States v. Wilson_, 895 F.2d 168, 172 (4th Cir. 1990) (per curiam).  And although they had their side arms, the officers kept their weapons holstered throughout the entire encounter.  _See_ _Elie_, 111 F.3d at 1145 (noting that "[n]either the drawing of a gun by the arresting officer, nor the handcuffing of the accused establishes involuntariness in and of [itself]") (internal quotation marks omitted).  There is also no evidence that either officer threatened Scott before he told them it was okay to get a cigarette from his car.  _See_ _Tyson_, 360 F. Supp. 2d at 806; _Weaver_, 282 F.3d at 312 (assessing the words, tone of voice, and general demeanor of law enforcement officers).  In total, the whole encounter, up to the point of the consent, took only a couple of minutes, according to the officers.  _See_ _Elie_, 111 F.3d at 1145 (finding that the environment was not coercive when the encounter "was not of inordinate duration"); _Lattimore_, 87 F.3d at 651 (same).

A defendant's cooperation also mitigates a finding of coercion.  _Smith_, 30 F.3d at 571.  "An encounter remains consensual as long as the citizen voluntarily cooperates with the police."  _Hinton_, 27 F. App'x at 255; _accord_ _United States v. Blanc_, 245 F. App'x 271, 273 (4th Cir. 2007) (per curiam)

18

(citing Weaver, 282 F.3d at 309-10). Claims of involuntary consent have failed where a defendant (1) gave her car keys to the law enforcement officers, even though she had initially refused to cooperate with them, Whitehead, 428 F. Supp. 2d at 452; (2) demonstrated an "eagerness to cooperate" and volunteered new information to law enforcement officers, Nanda, 1999 U.S. App. LEXIS 9028, at *16; and (3) cooperated with law enforcement officers merely to "deflect suspicion" from himself, Boone, 245 F.3d at 362. Here, Scott initially balked at cooperating and gave false answers about both the contents of the bag and the presence of anyone in his apartment. However, he admitted to where he lived and agreed to provide his identification. He also expressed interest in a cigarette during their encounter and agreed to Broadwell's offer to retrieve one for him. Moreover, had Broadwell felt that the officers had violated his rights as flagrantly as he claims by seizing the blue bag, it is unlikely that he would have consented to the search of his apartment, as he did in writing.

Furthermore, it is apparent on this record that Scott was aware of his right to refuse consent to Broadwell's entry into the car, even though officers did not explicitly advise him of it. See United States v. Drayton, 536 U.S. 194, 206 (2002) (noting that the Fourth Amendment does not require law

19

enforcement officers to "inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search"); see Tyson, 360 F. Supp. 2d at 808.

Finally, the encounter was less likely to be coercive because Scott has prior experience with the criminal justice system. Watson, 423 U.S. at 424-25 (noting that the fact a defendant is not a "newcomer to the law" is a factor weighing in favor of valid consent). He has at least one prior drug conviction (Doc. 9 at 1), and Davidson was aware that Scott had "a prior history for weapons and drugs."

Therefore, the court finds that Scott voluntarily consented to Broadwell's entry into his car.

## C. Plain View

The final issue is whether the warrantless seizure of the controlled substances was constitutional under the plain view doctrine. Once Broadwell was lawfully inside Scott's vehicle for the limited purpose of obtaining a cigarette for Scott, he observed what he believed to be marijuana in plain view. The discovery of incriminating evidence in plain view does not constitute a search under the Fourth Amendment. Horton v. California, 496 U.S. 128, 136-37 (1990). "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which

the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." <u>United States v. Jackson</u>, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing <u>Horton</u>, 496 U.S. at 136-37); <u>see</u> <u>id.</u> at 1109-11 (relying on third-party consent to search a residence for a person, finding drug paraphernalia in plain view, and using the drug paraphernalia as a basis for obtaining a search warrant).

In this case, the DPD officers satisfied the three-part test. First, upon Scott's agreement that Broadwell could retrieve a cigarette from the vehicle, which Scott indicated was in or near the console, Broadwell was lawfully present for that purpose (and there is no evidence Broadwell exceeded the scope of that permission). Second, Broadwell's testimony indicated that, without touching the blue bag or its contents, he could see the vegetable matter he believed to be marijuana as he retrieved the cigarette from the pack that rested on the seat near the blue bag which in turn contained the clear plastic bag containing marijuana. Third, based on Broadwell's experience and training, which he testified included "several hundred" cases involving marijuana, Broadwell concluded that the green leafy vegetable matter he observed was marijuana.

## III. CONCLUSION

For the foregoing reasons, Scott's motion to suppress (Doc. 10) is DENIED.


                                        /s/   Thomas D. Schroeder
                                        United States District Judge

December 6, 2010